[Civ. No. 15832. First Dist., Div. One. June 1, 1954.]

JEANETTE SAYADOFF, Appellant, v. LUTHER M. WARDA, Respondent.

Belli, Ashe & Pinney and Caroline D. Rose for Appellant.

Edmund J. Holl and William Lahanier for Respondent.

McMURRAY, J. pro tem.*—Plaintiff appeals from a judgment of nonsuit rendered after plaintiff's opening statement to a jury.

The action was based on a conspiracy by defendant paramour to commit assaults and battery upon plaintiff by committing abortions on her and rendering her sterile and causing permanent damage to her female organs and causing her extreme mental suffering.

Upon motion for nonsuit after opening statement it is unquestioned that "all favorable inferences reasonably to be drawn therefrom, must be accepted by the court as facts which would have been proved if the case had been allowed to be tried." (*Bias* v. *Reed*, 169 Cal. 33, 38 [145 P. 516]; *Moffitt* v. *Ford Motor Co.*, 117 Cal.App. 247 [3 P.2d 605].)

The opening statement recites, substantially, the following facts: Appellant, at the time of the abortion, which is the basis for this action, was 35 or 36 years old, and was a resident of San Francisco. She had been in this country since she was 6 or 8 years old, having come here from Syria. Respondent was a distant cousin, who came from the same Syrian town

---

*Assigned by Chairman of Judicial Council.

as did appellant, and was friendly with appellant and her husband while she was married, and became more friendly with her after her divorce in 1948. Mrs. Sayadoff was given custody of the three children of that marriage at the time of the divorce and thereafter supported herself in good health until the time of the abortion which was the basis of action here. Since this abortion she has been able to do little work and her health will remain bad for the rest of her life.

Respondent and appellant began a course of meretricious sexual relations after appellant's divorce, and respondent often told her that he was in love with her and wanted to marry her. These relations resulted in appellant becoming pregnant in about July of 1948. At the "importuning" of respondent appellant went to Portland, Oregon, where she was aborted. At that time appellant knew nothing about the procedure or "anything else." The respondent made the phone call to the clinic where the abortion was performed, gave appellant $350, and she went to Portland from San Francisco, apparently alone, on the train, and had an abortion performed and was "placed on the train" and returned to San Francisco. Upon her return she again resumed the meretricious relationship with respondent and again became pregnant. In December of 1948 appellant again, apparently alone, went to Portland on the train, after respondent had phoned the clinic, and again was aborted, "placed on the train" and returned to San Francisco. This time respondent gave her $500 for the abortion.

In August of 1949, having again become pregnant, appellant again followed the same procedure. ". . . when Mrs. Sayadoff went up there, she knew nothing of this place, nothing of the doctor, nothing of the procedure or nothing of the establishment, but that it was all known by Mr. Warda and the arrangements were completely and entirely made by Mr. Warda and at his behest."

After this last trip appellant was ill and it became necessary to remove her female organs.

In the language of counsel it is said: ". . . of course, it is not contended here that Mr. Warda himself performed the abortion; it is contended, and very much contended, that it was through the offices of Mr. Warda, the importuning of Mr. Warda, the selection by Mr. Warda of the abortionist, the payment for her to go to this abortionist, that the abortion was done."

At the conclusion of this statement and upon the motion

for nonsuit the trial judge said in part: ". . . if all the facts stated in the opening statement were presented to a jury, I don't think the case would be entitled to go to the jury. I don't think a jury could make a finding entitling the plaintiff to recover against the defendant."

Some mention is made in the briefs filed herein that because the action was dismissed as to the abortionist and other named defendants, the action for conspiracy must fail. This is not the law. ■ One conspirator may be sued as one of several tort feasors and the failure to join the coconspirators is not fatal to the action, for as is said in *Biggs* v. *Tourtas,* 92 Cal. App.2d 316, at page 322 [206 P.2d 871] : " 'In an action for damages resulting from acts of conspirators, the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity.' " If an abortion is an actionable tort the opening statement is sufficient to show a conspiracy.

■ Appellant contends that here there was no consent on her part to the claimed tort, that she was "importuned" by respondent and that she passively submitted. Under the facts outlined in the opening statement it is difficult to see how she can seriously support this contention. Even resolving, as we must, every favorable inference which might reasonably be drawn from the opening statement in appellant's favor, still there would appear to be consent on her part to participation in the act. The relationship of the parties, their intimacies, their common foreign extraction, are not enough to show that appellant did not consent to the acts here in question. She was 35 or 36 years old, with sufficient intelligence to be self-supporting, had been married and had children, and had lived in this country for 27 to 28 years. The fact that she was "importuned" by respondent shows nothing more than that he urged her to submit to this last abortion. She rode on the train alone and submitted to the operation several hundred miles removed from the importuning of respondent. The only reasonable inference from this is that there was a consent to the act. The case of *People* v. *Dong Pok Yip,* 164 Cal. 143 [127 P. 1031], is not in point. There it appeared that a 9-year-old boy of inferior mentality submitted passively to an assault. The court pointed out that "consent" and "assent" have a different meaning, and that

no consent could be based upon passivity of the mentality before it.

The main question here presented is whether, under such facts, one who arranges for an abortion is liable in tort to the woman who submits thereto.

The question appears to be one of first impression in this state, although there have been similar cases relating to recovery for injuries sustained by abortions in other jurisdictions. These cases divide sharply in their results: one line allowing recovery, the other line denying recovery. They are collected in a note in 21 A.L.R.2d 369.

Those cases allowing recovery are in general accord with the reasoning contained in *Milliken* v. *Heddesheimer*, 110 Ohio St. 381 [144 N.E. 264, 33 A.L.R. 53], to the effect that although it is the general rule that where a plaintiff has consented to the act by which he is injured he cannot recover, it is otherwise where the public peace or the life of a citizen is involved, since that is a matter in which the state has an interest. Also it is there stated that there can be no power to consent to an act forbidden by law, and such a consent is illegal and void. The case was one wherein the administrator of a woman who died as the result of an abortion sought to and did recover from the abortionist, and the court states that no one may consent to the taking of his own life; and further, that no one can defend an action for injury to another's person on the ground of such other's consent to the injury, as the life and persons of individuals are guarded in the interest of the state.

In support of the view allowing recovery it has been argued that the state's interest is material, since, by consenting to injuries, its citizens may become public charges with attendant expense to the state. Some consideration has also been taken of the possible deterrent effect upon wrongdoers of imposing upon them the liabilities of civil actions as well as criminal actions.

Those cases which deny recovery are typified by *Miller* v. *Bennett*, 190 Va. 162 [56 S.E.2d 217, 21 A.L.R.2d 364], wherein the court denied recovery against the abortionist for injuries and death of a woman growing out of an abortion. The court relied on the general rule that a party who consents to and participates in an immoral or illegal act cannot recover damages from other participants for the consequence of that act. In the opinion (21 A.L.R.2d 364, 366) the court quotes as authority the statement of Lord Mansfield in *Holman* v.

*Johnson,* 98 Eng.Rep. 1120 : " 'No Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa, or the transgression of a positive law of this country, there the Court says he has no right to be assisted. It is upon that ground the Court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff.' "

In *Goldnamer* v. *O'Brien,* 98 Ky. 569 [33 S.W. 831, 56 Am. St.Rep. 378, 36 L.R.A. 715], it was held that a woman who consented to treatment for the purposes of procuring an abortion could not recover from the persons who aided her in securing a doctor to produce the abortion, on the ground that a party who participates in an illegal act cannot profit by such act.

Where, as here, a paramour arranges an appointment with an abortionist, and the woman to be aborted travels several hundred miles, unescorted, for the third time in a little more than a year, and the abortion results in injuries to that woman, it would appear that she should not recover, at least against the paramour.

The maxim "volenti non fit injuria" would seem applicable. The appellant was experienced in these operations. She undertook to submit herself to the abortion after having been a participant in two prior abortions at the same place. The respondent, whose actions and conduct are assuredly indefensible, took no active part in the performance of the abortion other than "importuning" appellant to submit thereto and paying therefor after making telephonic arrangements for appellant's admission. She, alone, submitted.

Admittedly, the court should discourage the violation of the penal statutes of this state, but it is highly doubtful that this end should be sought through the medium of civil litigation. It is also highly doubtful that any deterrent would be afforded by allowing damages in such a case as this. Such holding might well encourage a line of conduct such as we have before us,—the submission to abortions with no complaint if they are successful, but with the assurance of financial reward if the woman participant is injured.

The Restatement of Torts, section 60, adopts the rule of the Miller case denying recovery, but seems to limit its scope by Illustration 4 to an "abortion . . . skilfully performed." It would seem unwise to attempt to set up standards of skill in such cases, and nothing herein said should be so construed.

Where one submits to an illegal act voluntarily and suffers injury thereby, the interest of the state in the individual's health would seem somewhat remote, and also it is highly speculative to assume that in such instances the injured person will become a public charge.

Under the facts here before us the judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a hearing by the Supreme Court was denied July 28, 1954.